IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 3, 2011 Session

## KEILAH GONZALEZ-BONILLA v. EDUARDO MENDEZ

**Appeal from the Fourth Circuit Court for Knox County**
**No. 100190     Bill Swann, Judge**

---

**No. E2010-01707-COA-R3-CV-FILED-JUNE 28, 2011**

---

Keilah Gonzalez-Bonilla ("Mother") and Eduardo Mendez ("Father") are the divorced parents of a minor child ("the Child"). At the time of the divorce, Mother was named the primary residential parent of the Child, and Father was granted visitation. After the divorce, Mother relocated and a revised permanent parenting plan was entered on August 3, 2007. In December of 2007, Father filed a petition seeking a change in custody of the Child alleging that a material change in circumstances had occurred. After a trial, the Trial Court entered its order on August 4, 2009 finding and holding, *inter alia*, that there had been a material change in circumstances since February 5, 2007, that custody would be changed with Father to be the primary residential parent, and that the joint decision making would be changed and Father shall have the decision-making authority. Mother appeals to this Court. We find that the proper date from which to determine whether there had been a material change in circumstances is the date the previous order was entered, i.e., August 3, 2007, and that a material change in circumstances sufficient to justify a change in custody had not been proven. We, therefore, reverse the Trial Court's order changing custody, and remand this case to the Trial Court for reconsideration of its orders regarding child support in light of this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Wanda G. Sobieski, Diane M. Messer, and Maia A. Niemann, Knoxville, Tennessee, for the appellant, Keilah Gonzalez-Bonilla.

Jerrold L. Becker, Knoxville, Tennessee, for the appellee, Eduardo Mendez.

# OPINION

## Background

Father and Mother were divorced in 2005, and Mother was named the primary residential parent for the Child with Father having visitation. After the divorce, Mother and the Child moved to Florida. Father filed a petition seeking to modify the permanent parenting plan entered at the time of the parties' divorce. The parties participated in mediation on February 5, 2007 and reached an agreement at the mediation with regard to a new permanent parenting plan. The Trial Court entered an Agreed Order on August 3, 2007 finding that the parties had successfully mediated, and entering a new permanent parenting plan ("the Parenting Plan").

The Parenting Plan, like the original plan, named Mother the primary residential parent with Father to have visitation, but the visitation schedule was adjusted to account for the fact that Mother and the Child lived in Florida and Father lived in Tennessee. The Parenting Plan provided for joint decision making of major decisions concerning the Child. Father exercised visitation with the Child by either traveling to Florida or making arrangements for the Child to travel from Florida to Tennessee.

In December of 2007, Father filed a petition to modify alleging that a material change in circumstances had occurred and seeking a change in custody to name Father as the primary residential parent, among other things. The case was tried in June of 2009.

Father testified at trial that he lives with his new wife and their baby daughter. Father married his new wife in September of 2007. Father testified that he had asked Mother if his parents could pick the Child up on the Thursday prior to his wedding to bring the Child to Knoxville for the wedding. Father testified that Mother stated: "No. He's not allowed to miss any school. And if - - the only person who can pick him up is you. You're his father. It's your responsibility." The Child was in the third grade at that time and was familiar with and comfortable with Father's parents. Father testified that his wedding was scheduled for Saturday the 29th. Father testified that as a result of Mother's refusal to allow Father's parents to pick up the Child, Father had to fly to Florida to get the Child. Father flew to Florida on Friday the 28th, picked up the Child, and flew back to Knoxville the same day.

When asked about what happened with returning the Child to Florida after the wedding, Father stated:

> The wedding had been changed to Sunday. On Sunday I called [Mother], and
> I told her that [the Child] would be back that - - on Monday and that he would

-2-

be at school. At that point she started yelling at me, saying that if he wasn't there by 8:00 o'clock, she would have the police waiting for me. And I told her that he would be there.

Father testified: "My parents actually flew [the Child] back. Their flight was delayed. We saw [the Child] in the airport at that point. [The Child] - - my parents got to Florida, took him to school. He ended up missing the morning session, but he was there for half a day." When asked for further clarification, Father stated: "I called [Mother] on Sunday, telling her that I would bring him back on Monday, yes, that I would have him back on Monday."

Father was questioned about when he and his new wife changed the date of their wedding from Saturday to Sunday and Father stated: "I don't recall." When asked, Father admitted that when he picked the Child up on Friday, Father knew that he was not going to be returning the Child on Sunday. A copy of Father's and his new wife's pre-printed wedding invitation was introduced as an exhibit at trial, and shows that the wedding was scheduled for Sunday, September 30th at 6:00 p.m.

When Father was asked about not telling Mother ahead of time that the Child would not be returned to Florida until Monday, he stated: "that's what I had to do to be able to have [the Child] in my wedding. She would not allow him to miss any school." When asked specifically about his testimony that he told Mother on Sunday that he would have the Child in school on Monday morning, Father stated: "The plan was to have him at school early in the morning. My parents' flight got delayed." Father testified that his parents had a pre-scheduled flight back to Florida on Monday, but claimed he did not know what time the flight was scheduled to get to Florida. Father stated that he does not believe that his parents ever called Mother or the Child's school when their flight was delayed. Father testified that he was traveling on his honeymoon to Mexico with his new wife by Monday morning, and that he never called Mother to tell her that his parents' flight was delayed.

Father testified about an incident that occurred in November of 2007 while Mother was in Knoxville, Tennessee for a child support hearing. Father stated that he made a phone call to the Child's school in Florida at that time and was informed that the Child was not in school. After learning that the Child was not in school, Father attempted to call Mother. When he got no response from Mother, Father drove to Mother's boyfriend's parents' home in Maryville, Tennessee where Father previously had dropped the Child off after exercising a visitation. As Father drove up toward the house he saw Mother and the Child in a car pulling away. Father followed Mother's car and attempted to reach his attorney by phone. Mother pulled into the parking lot at the West Town Mall in Knoxville, and Father pulled into the lot behind her. Mother got out of her car and made a comment about Father following her. Father asked Mother if he could have the Child for dinner, and

Mother told him that he could not because it was not his weekend to have the Child. Father described Mother's demeanor during this exchange as "almost a smug demeanor, just like, 'No. It's my weekend,' and just grabbed him and walked away."

Father described another incident that occurred in April of 2009 when Mother was in town for a trial management conference. Father testified that he requested to have the Child for dinner, but Mother refused.

Father claimed that he had problems with phone calls to the Child stating:

> I would call. There'd be no answer. Sometimes I would have to call again. And, yeah, sometimes I would call two or three times, and then somebody would finally answer. There was - - and even before the mediation with Mr. McMillan, almost every time I had a call, it would go to the voicemail. Then I had to call back, and then somebody would answer.

Father also testified that on some occasions his phone calls would not be returned.

Father has used Skype to have conversations with the Child via the internet so he can see the Child while they are talking. He testified that they started using Skype in August of 2008. Father introduced CDs of some of the Skype conversations he had with the Child. When asked, Father admitted that he spoke with the Child via Skype two or three times a week except for the weeks when the Child was in Knoxville. Father admitted when questioned that the CDs of the Skype calls that Father introduced as an exhibit show only a few minutes of conversations despite the fact that the Skype records show hundreds of minutes of conversations that Father had with the Child.

When asked about what effect Mother's behavior has on the Child, Father testified:

> He - - he - - it's a totally different child. [The Child] is a happy, loving, very touchy-feely kind of child. And when - - when [Mother's] around, he's different. He won't show any - - any emotion at all towards [Father's new wife] and doesn't show a lot towards me.
>
> And it's not even in her presence. Last summer we have had four incidents where, when she called him, he started crying on the phone because of things that she was telling him. And on all occasions, I - - [the Child] would hang up on her, and I said, "You have got to call her back." I make sure that he calls back. I've even got on the phone, and I've told her, "He's upset

-4-

about you putting pressure about school."… - - where I have told her that "He's upset about you bringing up all the school stuff. Let's just drop it. Talk to him, and you can bring it up later." And when I give him the phone back, he just starts bawling again.

Father testified that he allowed Mother to have the Child for Thanksgiving in 2007 even though it was Father's turn because Father would have had to celebrate with the Child in a hotel and Father believed that Thanksgiving was an important family holiday that should be celebrated at home. In exchange, Mother agreed to allow Father to have the Child for Thanksgiving in both 2008 and 2009.

Mother remarried in August of 2008. Mother lives with her new husband and was pregnant at the time of trial. At the time of trial, Mother was in the process of moving with her new husband back to East Tennessee.

Mother testified that: "[Father] has seen his son, as accorded in [the Parenting Plan], all the times that it has been arranged for him to see him, as well as he has had at least three conversations with him per week - - … - - if not more." When asked, Mother testified that she has never made disparaging remarks about Father or Father's new wife in front of the Child.

Mother explained that she has had difficulty in getting Father to help the Child with homework stating:

Usually when he goes with his dad for - - for vacation during the summer, which is long periods of time, usually schools have assigned reading and assigned tasks that when he comes back, he needs to be mastered on those. From third to fourth grade; it was specifically the math tables up to the twelfth and also two books, reading.

When asked if the Child completed this assigned work, Mother stated:

By June 30th, when they're talking about [the Child] being very upset when I talk to him, it was because I was asking him, "Do you know your tables?" And he started being very, very upset because I'd try, "Okay. Eight times four," and he wouldn't know any of the answers.… And by that time he hadn't - - it was the middle of summer, and he hadn't finished reading one book. And, in fact, when the grades came back, he got Ns on many of those and not satisfactory, because he flunked the tests given for those specific books he was to read for the summer.

Mother testified about another time when Father did not help the Child with homework during one of Father's visitations stating:

> Well, one of the weekends that I - - that I brought my son for his dad to spend time with him, I told him during pickup where he was with his wife at the airport that [the Child] had to do a five-paragraph essay on an insect and that this was due on Tuesday. He was specifically told, "He needs to do this this weekend, because it's due on Tuesday." And that was it, because that was basically all the information I knew of that, you know, five-paragraph essay.
>
> When I pick up the kid, when I pick up [the Child] on - - no. When he brought the - - [the Child] - - our son to the airport, we were sitting on the - - on the gate, and I said, "Well, where's your paragraph?" And he didn't answer…. Okay. He didn't have his - - his essay in his backpack. So I immediately called his dad, thinking he left it on the car. I don't want him leaving the airport with the essay that is done.
>
> So his dad said no. He told me he didn't need to do the essay. This is his dad on the phone with me while I'm in the gate. He told me he didn't need to do the essay.
>
> But I said to him, "I told you the essay needed to be done." And he said that the essay had been completed at school, when I know the essay is not completed, when I know we don't have the essay done, when I asked him to complete that task because it's homework due.

Mother then was asked what Father said to her and she stated: "He insulted me. He - - he called me a horrible two words for me asking for my son's homework." Mother agreed that she and Father have had difficulty communicating since that time and stated:

> I've tried to do as much as I can, and he has always seen his son on the time assigned. And he has been able to talk to him, and we have multiple phone communications, and every time there is a big event, he - - he is aware of his son.

Mother asserted, in an understatement, that she and Father are having communication problems.

After trial, the Trial Court entered its order on August 4, 2009 finding and holding, *inter alia*:

1. This Court measured the changes of circumstances from the Mediated Agreement of February 5, 2007 to present date, although noting that an Order was actually entered August 3, 2007.

2. This Court found that [Father] proved that there have been material changes of circumstances with respect to the parenting arrangement between the parties since February 5, 2007.

\* \* \*

11. The Court found that the Mother was largely present during Skype conversations between the child and his Father, perhaps due to the Mother's open floor plan in Florida. The Court found that to be inappropriate and ordered that that not take place hereafter.

12. The Court found that the Father should not have been trying to arrange times with the child....

The August 4, 2009 order changed custody to name Father the primary residential parent, and changed the decision making from joint to Father having the decision-making authority, among other things. Subsequently, the Trial Court entered orders adjusting child support in light of its decision to change custody. Mother appeals to this Court.

## **Discussion**

Although not stated exactly as such, Mother raises three issues on appeal: 1) whether the Trial Court erred in considering evidence of events that occurred prior to the date of the last entered order regarding parenting; 2) whether the Trial Court erred in considering evidence of events that were not pled but were alleged at trial; and, 3) whether the Trial Court erred in finding a material change of circumstances sufficient to warrant a change in primary residential custody. Father raises an issue regarding whether this appeal should be deemed frivolous, and requests an award of attorney's fees and costs.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in considering evidence of events that occurred prior to the date of the last entered order regarding parenting. Existing custody arrangements are favored because children thrive in stable environments. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). A custody decision, once made and implemented, is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). However, our Supreme Court has held that a trial court may modify an award of child custody "when both a material change of circumstances has occurred and a change of custody is in the child's best interests." *Kendrick v. Shoemake*, 90 S.W.3d 566, 568 (Tenn. 2002). According to the *Kendrick* Court:

> As explained in *Blair* [*v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002)], the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id*. at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id*. (citations omitted).

*Kendrick*, 90 S.W.3d at 570. *See also* Tenn. Code Ann. § 36-6-101(a)(2)(B) (2005).

The *Kendrick* Court went on to explain that if a material change in circumstances has been proven, "it must then be determined whether the modification is in the child's best interests … according to the factors enumerated in Tennessee Code Annotated section 36-6-106." *Kendrick*, 90 S.W.3d at 570 (footnote omitted). It necessarily follows that if no material change in circumstances has been proven, the trial court "is not required to make a best interests determination and must deny the request for a change of custody." *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999).

As our Supreme Court made clear in *Kendrick*, the material change in circumstances must have occurred "after the entry of the order sought to be modified …." *Kendrick*, 90 S.W.3d at 570 (quoting *Blair v. Badenhope*, 77 S.W.3d at 150). In the case now before us, the order sought to be modified was entered on August 3, 2007. Thus, it is this date, not the date upon which the parties mediated an agreement, which must be used as

the starting date to determine if a material change of circumstances has occurred sufficient to warrant a change of custody. The Trial Court erred when it considered matters prior to the entry of the order on August 3, 2007 because it "measured the changes of circumstances from the Mediated Agreement of February 5, 2007..." rather than from the August 3, 2007 date the order was entered.

Father argues on appeal that the mediated agreement which led to entry of the August 3, 2007 order is enforceable as a contract and that it became enforceable when it was reduced to writing and executed. Once a trial court has entered a permanent parenting plan establishing child custody, visitation, and support, the parties are not at liberty to change that plan without the trial court's approval of the proposed changes to the parenting plan.

We also note that while Mother executed the mediated agreement in March of 2007, Father did not execute it until July of 2007. Thus, even if we accepted Father's argument, which we do not for the reasons discussed above, the mediated agreement would not have been enforceable until executed by Father in July of 2007 mere weeks before the entry of the Trial Court's August 3, 2007 order. Thus, even if we accepted Father's argument, which we do not, only events after the "enforceable" date of the mediated agreement would be relevant, not events going back to February of 2007 or earlier.

As discussed above, the relevant date as concerns whether there has been a material change of circumstances is the date of the entry of the order sought to be modified. We agree with Mother that only matters occurring after August 3, 2007 may be considered in determining whether a material change of circumstances had occurred, and we will not, and do not, consider events occurring prior to that date.

We next consider whether the Trial Court erred in considering evidence of events that were not pled but were asserted at trial. With regard to this issue, several of Mother's allegations about matters not pled were about matters which occurred prior to the date of the entry of the order on August 3, 2007. As we have already found that consideration of those matters is not proper, as discussed fully above, we need not consider these matters any further. With regard to unpled matters that occurred after August 3, 2007, Mother asserts that Father made allegations at trial that he was denied telephone access to the Child. With regard to this allegation, the record on appeal reveals that Father admitted that he did have regular telephone and Skype conversations with the Child multiple times each week that the Child was not with Father. As such, even if this allegation was unpled, the proof in the record does not support Father's allegation of being denied telephone access to the Child, and we need not decide if it was error to allow Father to make this allegation at trial.

Finally, we consider whether the Trial Court erred in finding a material change of circumstances sufficient to warrant a change in primary residential custody. The evidence as discussed fully above does not show that a material change in circumstances has occurred since the date of entry of the order sought to be modified, August 3, 2007. The evidence shows that Father was not able to have the Child during two occasions when the Child was visiting Knoxville with Mother, but that those occasions were during times when Mother was scheduled to have the Child pursuant to the Parenting Plan. Thus, Father was not denied any visitation he was supposed to have during either of these incidents. Furthermore, the evidence shows that Mother did work with Father to re-arrange the schedule for Thanksgiving. The evidence in the record also shows that Father has been able to have regular telephone and Skype conversations with the Child as set in the Parenting Plan. Thus, the record does not show that Father has been denied his rightful access to the Child. In fact, the evidence reveals that Father wrongfully kept the Child during time that the Child was supposed to be with Mother pursuant to the Parenting Plan when Father failed to return the Child to Florida on time after Father's wedding.

The evidence in the record preponderates against the finding that a material change in circumstances occurred after August 3, 2007. As such, it is unnecessary to consider the issue of best interests. We reverse the Trial Court's August 4, 2009 order changing custody. We remand this case to the Trial Court for reconsideration, as necessary, of the Trial Court's orders with regard to child support in light of this Opinion.

We wish to point out that while the record on appeal does not show a material change in circumstances sufficient to warrant a change in custody, it does show that both parents have engaged in behaviors that are not in the best interests of the Child. The Trial Court found that Mother had been "largely present during Skype conversations between the child and his Father …." The evidence in the record does not preponderate against this finding, and this behavior is inappropriate on the part of Mother.

The record also shows that Father has lied to Mother with regard to visitations with the Child, most notably with regard to Father's and his new wife's wedding. Although the pre-printed wedding invitation introduced as an exhibit clearly shows that Father's wedding was scheduled ahead of time to occur on Sunday evening, Father deliberately lied to Mother telling her that the wedding was scheduled for Saturday and that Father would return the Child to Mother on Sunday. It is not conceivable that Father would have been able to return the Child to Mother in Florida on Sunday if the Child attended Father's wedding in Tennessee on Sunday evening. This is an example of Father behaving in a devious manner with regard to his communications with Mother.

The record reveals that both Mother's and Father's respective new spouses

-10-

have been positive influences in the Child's life. The Child is fortunate to have both parents and step-parents who love him and are concerned with his well-being. We sincerely hope that both Mother and Father take heed and behave in a manner consistent with the best interests of the Child.

As Mother has been successful on appeal, we decline to hold this appeal frivolous. In the exercise of our discretion, we further decline to award either party attorney's fees and costs.

### Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed against the appellee, Eduardo Mendez.

_____
D. MICHAEL SWINEY, JUDGE